11 CIV 1190

ROBERT WISNIEWSKI (RW-5308)
ROBERT WISNIEWSKI, P.C.
Attorneys for Plaintiffs
225 Broadway, Suite 1020
New York, NY 10007
(212) 267-2101

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X

SAMANTHA CHAPMAN and KENDRA VAN DYKE on behalf of themselves and all others similarly situated,

Plaintiffs,

-against-

ICAHN HOUSE WEST, LLC d/b/a CRF-HOUSE WEST, LLC, ICAHN HOUSE EAST, LLC d/b/a CRF-HOUSE EAST, LLC, CRF -CLUSTER MODEL PROGRAM, LLC, RICHARD GUZMAN, ORLANDO CRUZ, RAUSHAWN BOWENS, YOLANDA ROBERTS, TRISHA MCELROY and ROBERT J. LISENBEE

Defendants.

------------------------------------------------------------X

**Doc. No.:**

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## COMPLAINT

1. Plaintiffs Samantha Chapman-Green ("Green") and Kendra Van Dyke ("Van Dyke") on behalf of themselves and on behalf of all others similarly situated, by their attorneys, Robert Wisniewski P.C., as and for their Complaint against Icahn House West, LLC d/b/a/ Crf-House West, LLC ("Icahn West"), Icahn House East, LLC d/b/a/ Crf-House East, LLC ("Icahn East"), Crf-Cluster Model Program, LLC ("Cluster")(collectively, the "Corporate Defendants"), Richard Guzman ("Guzman"), Orlando Cruz ("Cruz"), Raushawn Bowens ("Bowens"), Yolanda

Roberts ("Roberts"), Trisha McElroy ("McRlroy") and Robert J. Lisenbee ("Bobby")(collectively, the "Individual Defendants"), state as follows:

## NATURE OF THE ACTION

2. Plaintiffs, on behalf of themselves and others similarly situated, bring this action under Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510 *et seq.* ("Title III") and the common law of the state of New York for the intentional unlawful interception and recording of Plaintiffs and others similarly situated's private communications. Defendants, social services organizations that provide services to poor residents of New York City, and their employees intentionally and willfully engaged in the surreptitious interception and recording of Plaintiffs and their other employees' private conversation via strategically placed microphones without their knowledge and consent.

3. The Corporate Defendants provide social services within the New York City area. Plaintiff Green was most recently employed by the Corporate Defendants as a director of building operations until her demotion in February 2010. Plaintiff Van Dyke was employed by Defendants as director of social services until her termination in April 2010.

4. The Individual Defendants are the officers, managers and/or employees of the Corporate Defendants, which provides social services within the New York City area, except for Bobby, who is an independent contractor who performs work on behalf of Defendants.

5. Plaintiffs and others similarly situated were employed by the Corporate

Defendants and were subject to Defendants' illegal interception and recording of their conversations in violation of federal and New York state law.

**PARTIES, JURISDICTION AND VENUE**

6. Plaintiffs, at all relevant times herein, were and are residents of the State of New York, County of Bronx.

7. The Corporate Defendants, at all relevant times herein, were and are foreign business corporations duly organized under, and existing by virtue of, the laws of the State of Delaware, but authorized to do business in the State of New York and having their principal place of business within the State of New York.

8. At all times herein, the Corporate Defendants transacted and still transact substantial business and derived and still derive substantial revenue from services rendered in the State of New York.

9. This Court has personal jurisdiction over the Defendants in that all Defendants' principal place of business is in the State of New York.

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331, in that this action arises under 18 U.S.C. § 2510 (Title III). This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. §1367, because those claims are related to Plaintiffs' federal claims and form part of the same case or controversy.

11. This Court is a proper venue for this action, pursuant to, among other grounds, 28 U.S.C. §1391(b) because events giving rise to Plaintiffs' claims occurred in this district, and because all Defendants may be found within this

district.

## JURY DEMAND

12. Plaintiffs demand a trial by jury of all issues so triable in this action.

## FACTUAL BACKGROUND

13. Plaintiff Green began her employment with Defendants in November 22, 1993 and worked until September 30, 2010. She initially began working for Defendants as a safety officer, and performed tasks such as monitoring the premises. In 2004, she was promoted to director of building operations for the Corporate Defendants' Cluster Model Program, which provides services to poor residents of New York City, and oversaw the management of one building containing 65 housing units and for all safety officers. Between 2004 and her termination, she gradually oversaw the management of 26 buildings and approximately 365 housing units.

14. As will be detailed below, Green was demoted to coordinator operator on February 24, 2010, after 16 years of work and without a single written warning, allegedly for poor work performance. On that date she became responsible for the management of the same number of buildings, but she was no longer responsible for the maintenance and security of the those buildings. She also received a $15,000 pay cut.

15. Green was injured on the premises of one of the buildings she managed and has been on disability since early March 2010. She was formally terminated on September 30, 2010.

16. Plaintiff Van Dyke began working for Defendants on July 23, 2007 as director of

social services for the Corporate Defendants' Cluster Model Program until she was fired on April 12, 2010. Her responsibilities include overseeing the social services that were provided to the residents of the 26 buildings and approximately 365 housing units to which the Corporate Defendants' Cluster Model Program provided services. As director of social services, Van Dyke managed a social service team that consisted of approximately 20-24 employees at any given time.

17. The Corporate Defendants provide social services for homeless families in New York City. These services include housing, referral to community organizations for services, which includes clothing, food, mental health, medical, child care, and employment services.

18. At all times relevant herein, Defendants Guzman was and is the regional director of building operations for the Corporate Defendants' Cluster Model Program. He was head of security and maintenance of all of the 26 buildings and 365 housing units that were provided services by the Corporate Defendants' Cluster Model Program.

19. At all times relevant herein, Defendant Bowens was the safety supervisor and was primarily in charge of security for all of the 26 buildings and 365 housing units that were provided services by the Corporate Defendants' Cluster Model Program. After Green's termination, Bowens was promoted to her previous position of director of building operations.

20. At all times relevant herein, Defendant Cruz was and is a safety officer employed by the Corporate Defendants and works at various office locations.

21. At all times relevant herein, Defendant McElroy was and is the head of human resources for the Corporate Defendants' Cluster Model Program.

22. At all the time relevant herein, Defendant Roberts was and is the executive director of the Corporate Defendants' Cluster Model Program.

23. At all the time relevant herein, Defendant Bobby provided information technology services for the Corporate Defendants' Cluster Model Program.

24. As of the date of Plaintiff Van Dyke's termination, the Corporate Defendants had offices in the following locations in the State of New York, County of Bronx:

a. 1175 Walton Ave.
b. 1173 Walton Ave.
c. 1097 Walton Ave.
d. 1453 Walton Ave.
e. 1758 Eastburn Ave.
f. 1520 Brook Ave.

***The Discovery of the Illicit Microphones and Plaintiff Green's Termination***

25. Plaintiff Green first discovered the existence of the microphones at 1175 Walton Ave. in March 2008.

26. In July 2007, Green was transferred from another location to 1175 Walton Ave. At that time, although she was aware that there were cameras installed, she did not notice that there were microphones installed in the walls.

27. In March 2008, Green was engaging in a discussion with Jason Benjamin ("Benjamin"), who was her administrative assistant, about work matters when Benjamin first revealed to Green that the 1175 Walton Ave. office contained microphones in the walls.

28. Indeed, Benjamin identified holes in the wall panels that seemed out of place and

appeared to contain small microphones. He also advised Green that the supervisors, namely Defendant Guzman, seemed to know everything that was discussed among the staff.

29. Upon information and belief, the microphones recorded the conversations that the employees were having and the security system allowed Guzman, as well as the other Individual Defendants, to listen to the employees' conversations.

30. Shortly after, Defendant Bobby came to 1175 Walton Ave. to fix the camera system that monitored the offices and the common areas, including the kitchen. The camera system fed the images to monitors installed in the security room at 1175 Walton Ave. These monitors showed various offices at 1175 Walton Ave. and other locations including 1758 Eastburn Ave.

31. Green approached Bobby while he was working on the camera system in the security room. In the presence of Defendant Bowens, she asked Bobby whether there were microphones in the 1175 Walton Ave.

32. Bobby was surprised by the question but admitted that he had installed microphones at 1175 Walton Ave. and at other sites and was concerned that he would be sued since the sign he had hung up, which clearly stated that there were security cameras <u>and</u> microphones installed, had been removed by the Corporate Defendants' management.

33. Green also noticed that the monitors that played the feeds from the security cameras had the symbol (M) at the upper corner of the screen. Green inquired as to what the (M) meant and Bobby explained that (M) meant microphone and that

each camera had a microphone associated with it.

34. Bowens, surprised by Bobby's frank admission and concerned that Green was now aware of the microphones, told Green that Bobby was joking and that there were not really any microphones in any of the buildings. Bobby did not respond to this charge.

35. Shortly after Bowens left the security office, Bobby again admitted that there were microphones installed in the 1175 Walton Ave. office and other offices. He also turned on the sound system for her so that she could hear the conversations that the microphones were intercepting.

36. A day or two later, Guzman, whose office was at 1520 Brook Ave., came to the 1175 Walton Ave. office to speak to Green. He admitted to Green that he had installed microphones at various locations in the 1175 Walton Ave. office and told her that there were microphones in the 1173 Walton Ave. and 1758 Eastburn Ave. offices as well.

37. Green, incensed that microphones were surreptitiously recording her personal conversations and the conversations of her co-workers, demanded that Guzman removed the microphones immediately. Guzman advised her that no one was listening to her conversations and that the microphones were there to allow Guzman and others to observe Benjamin and Victoria Gordon ("Gordon"), the executive director of the Corporate Defendants' Cluster Model Program at that time. Although Green was unhappy about the arrangement, she realized there was nothing she could do about it and agreed to continue working there.

38. During a conversation with Green shortly thereafter, Bowens admitted to her that Guzman had access to "the system" not only at the 1520 Brook Ave. office, but at his house as well. Green understood Bowens' reference to "the system" to refer to the sound feed coming from the microphones.

39. Green was forced to continue working with the knowledge that microphones had been recording her every statement. Green became increasingly perturbed , however, when Guzman repeatedly called her into his office at1520 Brook Ave. to chastise her for comments made by other employees, for which he held her responsible. Guzman constantly threatened to fire her or have her resign because of these statements.

40. In August 2008, upset about the presence of the microphones and Guzman's unwillingness to remove them, Green asked him if Stanley Bryce, the President of Corporate Defendants, knew about the existence of the microphones. Guzman responded in a threatening tone, and reminded her that he knows who she "fucks," who her family is, and who her friends are.

41. A week later, Guzman approached Green and promised her that he removed the microphones because he did not want to get into any professional or legal trouble. Around this time, Green also checked the security monitors in security room in the 1175 Walton Ave. office and noticed that the symbol (M) on the upper corner of the security monitors had disappeared. Bowens also told her that Bobby had removed the microphones from the other locations as well.

42. Green relied on Guzman and Bowen's unambiguous statement that he had the

microphones removed and that her private conversations were no longer being recorded. She also confirmed this fact by reviewing the security monitors in the security room, on which the symbol (M) had been removed.

43. From that day on until February 24, 2010, Green was under the mistaken but justified belief, caused by Defendant Guzman, that there were no more microphones at the 1175 Walton Ave. office and that her conversations were no longer being intercepted or recorded by electronic means.

44. On February 24, 2010, Green was called into McElroy's office where she was told that she was being improperly demoted for allegedly having performed no work the previous two weeks. As part of her demotion, she received a pay cut and her responsibilities were diminished. She had previously received no written warning of poor work performance.

45. Green was stunned by the demotion, and realized it must have been the result of comments about Guzman that she made privately and that he may have considered disparaging.

46. As a result of this surprising and unjustified termination, Green again suspected that there the microphones at the 1175 Walton Ave. office remained and were intercepting and recording her conversations. To confirm her suspicions, she went into the kitchen area and looked above the cabinet located there. To her surprise, she discovered a small microphone plugged into the wall. She also noticed a folded sign laying on top of the cabinet that stated that the premises were under the surveillance of cameras. Even more surprising, the sign had a part blacked out.

      When she looked more closely at the sign, she realized that the word "microphones" was blacked out.

47. Upon information and belief, at all various times herein, each of the Individual Defendants had been secretly listening to Plaintiffs and others similarly situated's private conversations that had been intercepted by the microphones and had also been recorded.

48. The following Monday, Green went out on assignment to one of the buildings she managed and was injured on the work premises, which has required multiple surgeries.

49. Although she was still on disability at the time, and had been employed by the Corporate Defendants for approximately 16 years, Green was terminated on September 30, 2010.

***Van Dyke's Termination***

50. Plaintiff Van Dyke first began working for the Corporate Defendants' Cluster Model Program on July 23, 2007.

51. Van Dyke was unaware of the existence of the microphones until after she was fired on April 12, 2010. She first learned of the existence of the microphones during a conversation with Plaintiff Green in late April 2010 after her employment was terminated.

52. From July 23, 2007 until March 2010, Van Dyke diligently and successfully performed her duties without incident.

53. On February 18, 2010, Guzman and Bowens invited Van Dyke to lunch during

work hours. The main topic on conversation was Green's work performance. Van Dyke was uncomfortable about discussing Green's work performance (especially at lunch during the work day) because (1) Van Dyke's position did not directly oversee Green, so she only had little to offer and (2) Bowens was Green's subordinate and she felt it was unprofessional to candidly discuss a superior's work performance in the presence of a subordinate. As a result she did not make any negative comments about Green.

54. The next day, in the presence of Roberts, Van Dyke complained to Bowens about the previous day's "fact-finding" mission to dig up dirt on Green.

55. On February 25, 2010, Van Dyke led a staff meeting that included virtually all of the staff.

56. At that meeting, Van Dyke candidly explained to the staff members that there might be future cuts to the budget as a result of the economy and that some jobs might need to be eliminated. The meeting was uneventful.

57. A few days later, Van Dyke learned that some staff members complained to human resources about Van Dyke's conduct at the meeting and claimed that she had used profanity and had threatened people's jobs.

58. Although Van Dyke obtained a number of signed statements from staff members who were at the February 25, 2010 meeting that plainly stated she did not use profanity or threaten anyone's job, she was suspended without pay for 5 days in late March 2010.

59. At the time of her suspension, Van Dyke discovered that Guzman and Bowens

went to various staff members and asked them to provide dirt on Van Dyke.

60. Van Dyke returned to work on April 8, 2010. During the day, in Benjamin's office, Van Dyke had a quiet conversation with Benjamin, who she often drove to work because they lived in the same neighborhood. They discussed Van Dyke's suspension and she made a joke and said that she wanted to go into her office and be "a good house nigger." Given the volume of the conversation, it was impossible that any other employee could have heard it.

61. On April 12, 2010, McElroy called Van Dyke into her office, told her she was fired for using the term "house nigger."

62. Roberts, who also attended the meeting at which Van Dyke was terminated, advised Van Dyke to look for an attorney.

**CLASS ACTION ALLEGATIONS UNDER TITLE III AND THE COMMON LAW OF THE STATE OF NEW YORK**

63. Plaintiffs bring this action on behalf of themselves and all other persons who were or are employed by the Corporate Defendants, and were subjected to the Corporate Defendants' unlawful behavior until Title III and the common law of the State of New York.

64. Upon information and belief, this class of persons consists of not less than 40 persons, and the class is thus so numerous that joinder of all members is impracticable under the standards of Fed. R. Civ. P. 23 (a)(1).

65. There are questions of law and fact common to the class which predominate over any questions affecting only individual members, specifically: whether Plaintiffs

and others similarly situated were injured by Defendants' violations of Title III. Only the amount of individual damages sustained by each class member will vary.

66. The claims of the Plaintiffs are typical of the claims of the above-described class in that all of the members of the class have been similarly affected by the acts and practices of the Defendants.

67. The Plaintiffs will fairly and adequately protect the interests of the members of the class, in that their interests are not adverse to the interests of the other members of the class.

68. A class action is superior to other available methods for the fair and efficient adjudication of the controversy under the standards of Fed. R. Civ. P. 23 (b)(3).

69. Plaintiffs bring the first, second, and fourth claims for relief herein on behalf of themselves individually and all persons similarly situated as a class action pursuant to Federal Rule of Civil Procedure 23, in respect to all claims that Plaintiff and all persons similarly situated have against the Defendants as a result of Defendants' violations under Title III and the common law of the State of New York.

**FIRST CLAIM FOR RELIEF**
**(Violation of Title III Against all Defendants)**

70. Plaintiffs repeat and reallege each and every allegation as previously set forth.

71. Plaintiffs' conversations were secretly intercepted by the microphones and, upon information and belief, were recorded by the security system.

72. Upon information and belief, each of the Individual Defendants, acting in their official and personal capacities, listened to Plaintiffs and others similarly

situated's conversations.

73. Plaintiffs and others similarly situated had a reasonable expectation that their private conversations would not be listened to by their superiors.

74. Plaintiffs and others similarly situated regularly met with clients in their offices and Plaintiffs and others similarly situated, as well as their clients, all had a reasonable expectation of privacy.

75. The Corporate and Individual Defendants intentionally installed microphones to intercept Plaintiffs and others similarly situated's conversations and, upon information and belief, secretly listen to those conversations.

76. That by virtue of the foregoing violation of Title III by Defendants, Plaintiffs have been damaged and can recover the amounts allowed by 18 U.S.C.A. § 2520, as well as statutory interest, and reasonable attorneys' fees and costs

**SECOND CLAIM FOR RELIEF**
**(Prima Facie Tort I against Defendants)**

77. Plaintiffs repeat and reallege each and every allegation as previously set forth.

78. The Corporate and Individual Defendants intentionally inflicted harm on Plaintiffs and others similarly situated by installing microphones that were used to intercept and, upon information and belief, record Plaintiffs and others similarly situated's conversations.

79. The installation of the microphones and the interception and, upon information and belief, recording of Plaintiffs and others similarly situated's conversations was without excuse or justification.

80. There was no business purpose to secretly intercepting and, upon information and belief, recording Plaintiffs and others similarly situated's conversations.

81. The interception and, upon information and belief, recording of Plaintiffs and others similarly situated's conversations would have been proper had Defendants provided them with notice of the existence of the microphones.

82. As a result Plaintiffs and others similarly situated have suffered special damages, up to and including termination.

**THIRD CLAIM FOR RELIEF**
**(Prima Facie Tort II by Plaintiffs against Defendants Except Bobby)**

83. Plaintiffs repeat and reallege each and every allegation as previously set forth.

84. Both Plaintiffs Green and Van Dyke were demoted and/or terminated from their position without just cause.

85. The Defendants, especially but not limited to Guzman, intentionally terminated Green, in part, because she had criticized Bowen's installation of the microphones and because she had threatened to inform Bryce about their existence.

86. The Defendants, especially but not limited to Guzman, intentionally terminated Van Dyke because she refused to make negative comments about Green.

87. These demotions and/or terminations were without justification or cause and were done specifically to retaliate against Green for complaining about the microphones' intercepting her conversations.

88. The termination of Green and Van Dyke would have been proper but for Defendants' malevolent motive.

89. As a result Plaintiffs have suffered special damages including the loss of their positions and the income derived, the security and income to be derived therefrom, and a diminution in job prospects and future earnings in their chosen profession.

**FOURTH CLAIM FOR RELIEF**
**(Negligent Hiring and Supervision by Plaintiffs against the Corporate Defendants)**

90. Plaintiffs repeat and reallege each and every allegation as previously set forth.

91. The Corporate Defendants had a duty to supervise its employees, servants and agents and to exercise due care in the hiring and retention of its employees, servants and agents.

92. The Corporate Defendants knew or should have known, as a result of the occurrences described above, that its employees, were secretly using electronic equipment to intercept and, upon information and belief, record Plaintiffs and others similarly situated's personal conversations via electronic means.

93. Upon information and belief, the Corporate Defendants failed and neglected to make any or appropriate inquiries with respect to the character and actions, of the Individual Defendants, aside for Bobby, prior to, at or subsequent to the time it employed them, even though their inappropriate and illegal conduct should have been known by the upper level management, including the President Bryce.

94. The Corporate Defendants had a duty to intervene to stop such conduct on the part of the Individual Defendants.

95. The Corporate Defendants were negligent in hiring the Individual Defendants, aside from Bobby, and in retaining them as employees.

96. The Corporate Defendants were negligent in supervising their employees with respect to the occurrences described above.

97. The Corporate Defendants' negligence proximately caused injury to Plaintiffs and others similarly situated by causing each to sustain damage in an amount to be determined at trial and each plaintiff is entitled to recover such amount from the Corporate Defendants upon the trial of this action.

98. The Corporate Defendants' conduct has been reckless and grossly negligent, and Plaintiffs are entitled to punitive damages.

[no more text on this page]

WHEREFORE, it is respectfully requested that the Court assume jurisdiction herein and thereafter Plaintiffs demand a trial by jury and judgment against all Defendants as follows:

a. Compensatory damages in an amount to be determined at trial, together with interest;

b. Punitive damages pursuant to Title III and the common law of the State of New York;

c. Pre-judgment interest;

d. An injunction, preliminary until a hearing on the merits and then permanent, prohibiting any further violations of Title III, New York Penal Law 250. 05, which contains no private right of action, and the common law of the State of New York, and ordering the immediate removal of the microphones from any of the Corporate Defendants' offices, as well as the immediate removal of Defendants Guzman and Bowens from their positions; and

e. Plaintiff's costs and reasonable attorneys' fees.

Together with such other and further relief that the Court deems just.

Dated: New York, New York
February 22, 2011

ROBERT WISNIEWSKI P.C.

By: ______________________
Robert Wisniewski, Esq.
Attorneys for Plaintiffs
225 Broadway, Suite 1020
New York, New York 10007
(212) 267-2101